**AUTOMĀTIC DIALING CORPORATION, Inc. v. MARITIME QUALITY HARDWARE CO., Inc.**

Civ. No. 428.

District Court, D. Maine, N. D.

July 2, 1948.

Sidney Wernick and Edward Berman, both of Portland, Me., for plaintiff.

George Peabody, of Bangor, Me., for defendant.

CLIFFORD, District Judge.

This is a controversy between a corporation having its principal place of business in the District of Columbia and a corporation having its principal place of business in Maine, involving an amount over the jurisdictional requirement. The subject matter of the suit is two contracts entered into by the two parties, and action subsequent to the execution of these contracts.

The first contract provided for the construction by the defendant of twelve "Tele-

dial" units in accordance with an operative model and drawings furnished by the plaintiff. The "Teledial" device, on which the plaintiff apparently holds a patent, is described as "a device for automatically dialing a series of numbers by a push button device". The maximum price to be paid for these twelve units was stated as $9,000. The delivery date was set as July 1, 1947, subject to extensions for delays not caused by defendant. The defendant undertook to "use its best efforts in conjunction with Autodial (the plaintiff) to refine or improve the construction of the parts of the device to best adapt the same to quantity production." Such changes were not to affect the above stated maximum price. An additional provision was that "major changes, if suggested by Maritime, shall first be approved in writing by Autodial and only made by Maritime after such approval is received." The defendant was granted the option, after completion of the twelve units, of contracting with the plaintiff for the exclusive production of the units on a mass production basis.

The second contract, executed on the same date as the first, March 31, 1947, set forth the conditions under which the defendant would undertake the manufacture of 100,000 units. The plaintiff promised to reimburse the defendant for the total tooling cost attendant on the production of the first 50,000 units and to release orders to the defendant in sufficient quantity to prevent any loss for the work undertaken. Provisions as to progress payments and liquidated damages were also included. The defendant promised not to supply such devices as those described in the contract to other than representatives of the plaintiff. In return the plaintiff stated that the defendant "Shall be the exclusive source of supply for Teledial units until such time as one hundred thousand (100,000) units shall have been delivered", unless the contract were earlier terminated.

Delivery of the twelve units under the first contract was not made by July 1, 1947. The defendant alleges that the operative model and drawings furnished by the plaintiff necessitated complete redesigning by the defendant, work done with the plaintiff's consent and pursuant to its request beyond the purview of the original contracts. The defendant also says that agents of the plaintiff were well aware of the redesigning work being done and of the manufacture of subassemblies of the units and that these agents assured the defendant that the plaintiff would underwrite the extra cost. Apparently the defendant, in this redesigning work, did not submit proposed changes in writing to the plaintiff. Defendant's contention is that a new oral contract superseded the original written contracts. The defendant further alleges that the plaintiff maliciously hindered the defendant's efforts by removing certain models and plans, and attempted to retain for its own use the fruits of the redesigning work.

The plaintiff later signified its intent to conform only to the provisions of the original contract, while the defendant refused to make delivery on that basis.

The plaintiff in its bill seeks total specific performance of the first contract, partial performance, or damages. The defendant in an answer and counterclaim prays for damages, or costs plus a reasonable profit on the redesigning and manufacture of the twelve units, and, in addition, prays for a temporary injunction preventing the plaintiff from making use of any of the plans, drawings, models, parts, materials, or information developed by the defendant.

Although the plaintiff neglected to file an answer to the defendant's counterclaim within twenty days, the circumstances were such that the Court allowed the plaintiff to file an answer substantially denying the defendant's allegations and praying that the counterclaim be dismissed.

The sole issue here to be decided is whether the defendant's motion for a temporary injunction should be granted. By agreement of counsel, decision was to be rendered pursuant to the filing of briefs.

The defendant seeks the aid of the injunctive process in order to preserve the status quo until the merits of the case are decided. It feels that, since the plaintiff now has possession of the original operative model of the unit together with models and data incorporating improvements made

by the defendant, the plaintiff is in a position to enter other contractual arrangements, begin producing the unit in quantity, and realize profits from the defendant's engineering and inventive work.

The Court's authority to issue a temporary injunction in this case is said to be based first on the doctrine that, since the plaintiff by seeking specific performance has invoked equity jurisdiction, a court of equity will proceed to adjudicate all matters at issue and can resort to such forms of relief as it thinks appropriate. The second alleged basis for an injunction is that, by giving the defendant the exclusive right to manufacture the units, the plaintiff has impliedly covenanted not to allow anyone else to manufacture them. It is argued that such an implied negative covenant can be enforced by a court of equity.

For this argument, the defendant cites the famous case of Lumley v. Wagner, 1 De G., M & G 604. In this case, however, as in other cases of enforcement of negative covenants, the promisee's damages, in the event of breach of the covenant, were not such as to be compensated adequately in an action at law. The promised services were personal and of a sort to be classified unique. It should be noted, moreover, that the defendant's proposed injunction is broader than any implied covenant, for the covenant would only concern manufacturing rights, whereas the injunction, as prayed for, would prohibit the plaintiff from "making use" of the plans, models, and data.

■ As for the power of a court of equity to grant an ancillary temporary injunction in the course of disposing of a case properly before it, it is the opinion of this Court that, although the general proposition is as the defendant has stated it, such auxiliary relief is not appropriate unless the danger of irreparable injury is clearly shown.

In Taylor v. Florida East Coast R. Co., 54 Fla. 635, 45 So. 574, 16 L.R.A.,N.S., 307, 127 Am.St.Rep. 155, 14 Ann.Cas. 472, the court acknowledges the power of a court of equity, once it has acquired jurisdiction of an action for specific per-

formance, to grant injunctions upon a proper showing. But it saw fit to add (54 Fla. at page 642, 45 So. at page 576, 16 L.R.A., N.S., 307, 127 Am.St.Rep. 155, 14 Ann.Cas. 472):

"In a proceeding for the specific performance of a contract, a temporary injunction will not be granted unless the allegations of the bill of complaint warrant a decree of specific performance, nor unless it also appears that an injunction is appropriate and just."

■ Apart from the question whether either the plaintiff or the defendant should have specific performance, it does not appear that an injunction, even of a temporary nature, would be appropriate. An injunction is appropriate, in this Court's opinion, if a threatened injury is irreparable or is not adequately compensated for by damages. This is a prerequisite to use of the injunctive process, even in cases where equity jurisdiction has already attached to the cause.

In this case, the defendant's title to the plans, models, drawings, parts, materials, and information allegedly developed by it is not at this point clearly established. As the plaintiff points out in its brief, even were these ideas patentable by the defendant, the latter could not seek to enjoin the plaintiff from using them until a patent had been issued. 40 Am.Jur. 659, and cases cited.

Moreover, not only has there been in the defendant's motion no allegation of irreparable harm but it has not been shown to the Court how an action for damages would be an inadequate remedy for any invasion of the defendant's rights before the final issue is decided by a trial upon the merits. The argument has been made by the defendant that were the plaintiff to enter into mass production and sale of the improved Teledial unit, the determination of defendant's damages, assuming defendant's rights had been infringed, would be exceedingly difficult.

■ The case of Halstead v. Schnitzpahn, Sup. 152 N.Y.S. 561, is in point. In that case the plaintiff sought specific performance of a contract by which the

defendant undertook·to furnish a patented device to the plaintiff, who in turn had undertaken to market the product through his sales agency. The plaintiff alleged in a general manner irreparable loss, but the court replied in words that are applicable on the question of an injunction in the instant case (at page 562 of 152 N. Y.S.):

"* * * but there is no allegation that the defendant is insolvent, or that he is in any wise incapacitated to respond in damages, and the mere fact that the plaintiff concludes that 'it would be difficult to establish the measure of damages, which this plaintiff would suffer if the defendant be not compelled to specifically perform his obligation under said contract,' does not meet the requirements of showing to the court the facts from which the inference of irreparable injury will proceed."

The motion for a temporary injunction must, accordingly, be denied and an order to that effect will be entered.